## MATTER OF LEE

### In SECTION 245 Proceedings

### A-10454029

*Decided by Deputy Associate Commissioner January 30, 1964*

To be eligible for nonquota status under section 2, Act of October 24, 1962, tne retention of status proviso to section 2 of that Act requires that as of the date of the application for adjustment of status under section 245, Immigration and Nationality Act, the beneficiary must have been performing the duties for which his services were sought in the approved petition filed in his behalf prior to April 1, 1962; such nonquota status is retained notwithstanding a change from his original employment between the date of filing and date of final adjudication of his section 245 application since such change of employment, which resulted in the approval of another first-preference visa petition in his behalf, was a continuation of research commenced and was effected, under the same research grant, to take advantage of better facilities. [Cf. *Matter of Gupta*, Int. Dec. No. 1402.]

The applications for adjustment of status under section 245, 8 U.S.C. 1255, of the Immigration and Nationality Act were denied by the Officer in Charge, Milwaukee, Wisconsin on August 22, 1963, on the ground that immigrant visas were not immediately available to the applicants. On December 26, 1963, the applications were reopened and certified to this office "for such further consideration as may be warranted."

The principal applicant, Dr. Ya-Pin Lee, born at Taipeh, Formosa on October 23, 1924, was admitted to the United States on July 20, 1955, as an exchange visitor. He had received an M.D. degree from National Taiwan University, Formosa in 1949 and a Ph. D. from Kyushu University in Japan in 1955. He conducted post-doctorate research in biological chemistry at the Enzyme Institute of the Univeristy of Wisconsin from July 1955 to September 1957, at the Washington University School of Medicine from September 1957 to September 1959 and again at the University of Wisconsin from September 1959 to July 1, 1963, at which time he accepted the position of Hill Research Professor of Biochemistry at the University of North Dakota, which position he holds presently. There is ample evidence that sub-

ject is outstanding in his field and that he has made important contributions to medical science.

Dr. Lee was married in Taiwan to Lin-lin Liu on December 7, 1950. She was born at Taipeh on July 11, 1925. They have three children, all born at Taipeh: Andrew Shu-tsung, October 31, 1951; Nicolos Chien-tung, August 30, 1953; and Benedict Chien-nan, December 4, 1954.

The principal applicant was subject to the two-year foreign residence requirement of section 212(e), 8 U.S.C. 1182(e), by virtue of his admission to the United States as an exchange alien. However, on October 26, 1959 the foreign residence requirement was waived by the Service upon the favorable recommendation of the Secretary of State pursuant to the request of the Department of Defense.

On October 28, 1959, the University of Wisconsin filed a petition to accord Dr. Lee first preference status as a Research Biochemist. The petition was approved on December 15, 1959, and subsequently revalidated to December 15, 1962. Following the enactment of P.L. 87-885 on October 24, 1962, which accorded nonquota status under certain conditions to beneficiaries of first preference petitions filed prior to April 1, 1962, he and his family, who had been paroled into the United States on October 22, 1961, were invited by the Service to apply for adjustment of status to permanent residents. This they did on November 20, 1962. It is noted that the principal applicant was then and continued to be until July 1, 1963, employed by the University of Wisconsin performing the duties set forth in the visa petition filed October 28, 1959.

As part of the processing of the applications, requests for information from consular records were forwarded to the United States Embassy at Taipeh on December 12 and December 13, 1962, pursuant to outstanding instructions, as the applicants had resided in Taiwan prior to entering the United States. By January 3, 1963, all required action had been taken and all documents necessary to adjudicate the case had been received, except for the report from the Embassy.

The Embassy, at that time, had received an unprecedented number of similar requests in connection with other former residents of Taiwan who had simultaneously become prima facie eligible for adjustment of status through the enactment of P.L. 87-885 on October 24, 1962. As a result, the response from the Embassy, which contained no derogatory information, was not received by the Service until August 19, 1963.

When the consular report was received, a routine letter was forwarded to the University of Wisconsin, applicant's petitioner, to ascertain if applicants were still entitled to first preference status. Upon being advised that Dr. Lee had transferred to the University of North Dakota on July 1, 1963, the applicants were advised on August 22, 1963,

that inasmuch as Dr. Lee was no longer employed by the petitioner, they were no longer entitled to nonquota status (under section 2 of P.L. 87–885) ; further that approval of their applications for adjustment of status was contingent upon immigrant visas being immediately available and that, since visas under the quota for Chinese persons, to which they were chargeable, were not available, the applications were denied.

Subsequently, on September 4, 1963, a petition by Dr. Lee's present employer, the University of North Dakota, was filed to accord him first preference quota status as Research Professor of Biochemistry. This petition was approved on September 16, 1963.

The following is quoted from a December 2, 1963, letter to the Service from Dr. Henry Lardy, Professor of Biochemistry and Chairman of the Enzyme Institute at the University of Wisconsin:

> Dr. Lee's work has dealt mainly with the mode of action of the thyroid hormones, a problem that is of importance not only to medicine but to problems of stress and adaptation to unusual environments. The work that Dr. Lee was carrying out at the University of Wisconsin is being continued by him at his new post. He is completing experiments started in this laboratory. and is expanding his program because of additional facilities available to him at the University of North Dakota.

The following is excerpted from a November 22, 1963, letter to the Service from W. E. Cornatzer, Ph. D., M.D., Professor and Head of the Department of Biochemistry and Director of the Ireland Research Laboratory at the University of North Dakota:

> Dr. Lee is conducting the same research that he was doing at the University of Wisconsin. In fact, he is still carrying out jointly research with Dr. Henry Lardy of the University of Wisconsin. I have asked Dr. Lardy to write you a letter to confirm this. Dr. Lardy filed the First Preference Quota for Dr. Lee December 15, 1959.
>
> Dr. Lee's salary at the University of Wisconsin was being paid by U.S. Public Health Research Grant. Dr. Lee transferred this same research grant to the University of North Dakota for him to continue his research. His salary now is being paid by another research grant given to the University of North Dakota.

The foregoing indicates that Dr. Lee was continuing the research commenced at the University of Wisconsin, under the same grant, and had transferred his operations to the University of North Dakota to take advantage of the better facilities there.

It now becomes necessary to examine the statute which accorded applicant nonquota status on October 24, 1962. Section 2 of the Act of October 24, 1962, P.L. 87–885, provides as follows:

> Any alien eligible for a quota immigrant status under the provisions of section 203(a)(1) of the Immigration and Nationality Act (8 U.S.C. 1153) on the basis of a petition filed with the Attorney General prior to April 1. 1962. shall be held to be a nonquota immigrant and may be issued a nonquota immigrant visa: Provided, That upon his application for an immigrant visa and

for admission to the United States or for adjustment of his immigrant status in the United States pursuant to section 245 of the Immigration and Nationality Act (8 U.S.C. 1255) the alien is found to have retained his status as established in the approved petition. This section shall be applicable only to aliens admissible to the United States except for the fact that an immigrant visa is not promptly available for issuance to them because the first 50 per centum of the quota of the quota area to which they are chargeable is oversubscribed by beneficiaries of petitions approved by the Attorney General pursuant to sections 203(a)(1) and 204 of the Immigration and Nationality Act (8 U.S.C. 1153, 1154) prior to the date of enactment of this Act.

Section 2 of the Act of October 24, 1962, was remedial in nature, intended to benefit aliens (A) whose services had been determined by the Attorney General to be needed urgently in the United States because of the high education, technical training, specialized experience, or exceptional ability of such immigrants and to be substantially beneficial prospectively to the national economy, cultural interests, or welfare of the United States, and (B) to qualified quota immigrants who are the spouse or children of any immigrant described in clause (A) if accompanying or following to join him. As such, it may be construed liberally. However, the provisions of that section require nothing more than an ordinary and reasonable interpretation to reach the conclusion that the instant applications could and should have been granted. It accords nonquota status to the beneficiary of a first preference petition filed prior to April 1, 1962, *Provided*, That, *upon his application* for (1) an immigrant visa and for admission to the United States or (2) adjustment of his immigrant status in the United States pursuant to section 245 of the Immigration and Nationality Act, the alien is found to have retained his status as established in the approved petition.

Section 2 of the Act of October 24, 1962, is interpreted as requiring that *as of the date of application for adjustment of status* the applicant must have been performing the duties for which his services were sought, *in the employ of the petitioner whose approved petition in his behalf was filed prior to April 1, 1962*. Under this remedial legislation, to hold that the applicant must have remained in the employ of that petitioner after the application for adjustment was filed and until it was approved, would work undue hardship upon highly qualified aliens, such as Dr. Lee, whose services are needed urgently and who, although not employed by the original petitioner at the time of adjustment of status, might be performing even more important services for another petitioner. To hold otherwise might penalize deserving aliens, such as Dr. Lee, because of delays in the administrative processing of their cases, perhaps completely unreasonable and certainly beyond their control, and might well deny this country the full benefit of their talents and abilities if they were to be held captive in their

original jobs, afraid to accept more progressively responsible positions in their fields lest they lose the nonquota status accorded them. It is the opinion of the Service that this was not the intent of Congress in enacting this remedial legislation, and to so hold would circumvent the statute's true purpose.

This is not the case of an alien who used the device of a first preference petition to gain a beneficial quota (or nonquota) classification and having gained that benefit wilfully abandoned the vocation or profession so that his urgently needed services were lost to the United States. Such a case would warrant denial of the application for adjustment as a matter of discretion. As indicated above, the applicant in this case is actually engaged in the same field as that which was found to warrant approval of the original visa petition in his behalf.

It having been satisfactorily established that the applicants are entitled to nonquota status pursuant to section 2 of the Act of October 24, 1962, are eligible in all respects to receive immigrant visas and are admissible to the United States, their applications will be granted.

ORDER: It is ordered that the order of the Officer in Charge, Milwaukee be and the same is hereby withdrawn.

It is further ordered that the applications for status as permanent residents be and the same are hereby granted.

768-456—65——46